IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SACKS HOLDINGS, INC.,           )
                                )
            Plaintiff,          )
                                )
      v.                        )        1:23cv1058
                                )
GRIN NATURAL USA LIMITED, et al.,  )
                                )
            Defendants.         )

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on "Sacks Holdings, Inc.'s Motion to Exclude Untimely Produced Evidence" (Docket Entry 108 (the "Evidence Motion") at 1 (all-cap and bold font omitted))[1] and "Sacks Holdings, Inc.'s Motion to Strike Untimely Expert Report" (Docket Entry 110 (the "Expert Report Motion") at 1 (all-cap and bold font omitted)). For the reasons that follow, the Court will grant the Evidence Motion and the Expert Report Motion (collectively, the "Motions").

## BACKGROUND

Asserting various state and federal claims arising from alleged trademark infringement, Sacks Holdings, Inc. (the "Plaintiff" or "Sacks") sued Grin Natural USA Limited, Grin Holdings Limited, Grin Natural US Limited, and Grin Natural Products Limited (collectively, the "Defendants" or "Grin") for,

---

[1] Given the parties' pending sealing motions, this Opinion confines its quotations to material that clearly does not qualify for sealing. [Docket Entry page citations utilize the CM/ECF footer's pagination.]

inter alia, trademark infringement under the Lanham Act, 15 U.S.C. § 1114. (<u>See generally</u> Docket Entry 1.) Asserting priority rights to the disputed mark, Defendants filed state and federal counterclaims against Plaintiff, including for trademark infringement under the Lanham Act, 15 U.S.C. § 1114. (<u>See generally</u> Docket Entry 16.) In their respective pleadings, Plaintiff and Defendants asserted entitlement to recovery of any profits attributable to the infringement. (<u>See, e.g.,</u> Docket Entry 1, ¶ 65 ("Plaintiff is entitled to, among other relief, injunctive relief and an award of actual damages, Defendants' profits, enhanced damages and profits, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest."); Docket Entry 16 at 40 ("Grin is entitled to its damages, Sacks' profits, and attorneys' fees, in an amount to be determined. Grin is also entitled to the trebling of any damages award as allowed by law.").)

On February 29, 2024, the parties jointly submitted a Rule 26(f) Report (Docket Entry 22) (the "Joint Rule 26(f) Report"), which noted that "[d]iscovery will be needed on" (<u>id.</u> at 1), inter alia, "the parties' alleged damages" (<u>id.</u> at 2). The parties proposed that discovery commence on February 29, 2024, and that they exchange initial disclosures under Rule 26(a) of the Federal Rules of Civil Procedure (the "Rules") on March 8, 2024. (<u>Id.</u> at

1.) The parties proposed August 30, 2024, as the deadline for completing "[n]on-expert fact discovery," and "December 6, 2025" [sic], as the deadline for completing "expert discovery." (<u>Id.</u> at 2.) They also proposed September 2, 2024, as the deadline for initial reports from "retained expert witnesses under Rule 26(a)(2)," with "[r]esponse/rebuttal reports by September 27, 2024," and "[s]upplementation . . . due as provided in Rule 26(e) or as otherwise ordered by the Court." (<u>Id.</u>) The Court

> adopt[ed the] Joint Rule 26(f) Report, with the following clarifications: (1) the deadlines . . . regarding service of reports from retained experts under [Rule] 26(a)(2)(B) also apply to any expert disclosures under [Rule] 26(a)(2)(C)[ and] (2) the deadline for the completion of expert discovery is [December 6, ]2024 (not 2025) . . . .

(Text Order dated Mar. 2, 2024 (the "Scheduling Order").)

Also on February 29, 2024, Plaintiff served written discovery requests on Defendants. (<u>See</u> Docket Entry 52-1.) As relevant to the Motions, these discovery requests included the following Requests for Production of Documents (each, a "Request") and Interrogatories:

> **Request No. 28**: Documents sufficient to show the volume (in U.S. dollars and units), by month, of sales of all goods or services sold or licensed under or in connection with Defendants' use of the GRIN mark for each of the last seven years in the United States.

> **Request No. 29**: Documents sufficient to show, by month for each of the last seven years, all costs and amounts expended by any Defendant or its licensee(s) to promote, market, and advertise goods or services actually or planned or intended to be sold, offered, distributed, provided, or licensed under or in connection with the "GRIN" mark in the United States.

3

> **Request No. 30:** Documents sufficient to show, by month for each of the last seven years, all profits realized by any Defendant or its licensee(s) based on the promotion, marketing, advertising, offer for sale, and sale of goods or services actually or planned or intended to be sold, offered, distributed, provided, or licensed under or in connection with the "GRIN" mark in the United States.

(<u>Id.</u> at 20.)

> **Interrogatory No. 10:** Identify and describe the nature and amount of profits derived from the sale in the United States of any goods under or in association with the "GRIN" mark, by month, describing with particularity the methodology used to compute or otherwise arrive at each element and the total amount thereof.

> **Interrogatory No. 11:** For each of the last seven years, describe all costs and amounts expended by Defendants or its licensee(s) to promote, market, and advertise goods or services actually or planned or intended to be sold, offered, distributed, provided, or licensed under or in connection with the "GRIN" mark just in the United States, including but not limited to dollars (USD) spent on advertising and marketing in the United States and a listing of all meetings (virtual or otherwise) with retailers in the United States.

(<u>Id.</u> at 8-9.)

On April 1, 2024, Defendants responded to Plaintiff's discovery requests. (<u>See</u> Docket Entry 52-2.) Defendants lodged various objections to the foregoing Requests and Interrogatories (<u>see id.</u> at 11-12, 37-38), but agreed, "[s]ubject to and without waiving [their] objections," to "produce non-privileged documents in its [sic] custody and/or control responsive to th[e relevant R]equest" (<u>id.</u> at 37-38) or from which Plaintiff could obtain information responsive to those two Interrogatories (<u>see id.</u> at 11-12). Defendants further promised to "supplement their response to

4

th[e relevant] Interrogatory with the identification of the production range for any documents produced that are responsive to th[e] Interrogatory." (Id.)

On June 7, 2024, Plaintiff moved to compel responses to its discovery requests, including to the above-listed Requests and Interrogatories. (See Docket Entry 77 (the "Motion to Compel").) In opposing the Motion to Compel, Defendants maintained that

> Defendants have produced documents sufficient to show all sales into the US of products bearing its GRIN Marks through 2020. Defendants' counsel is working with Defendants to produce additional sales documents through the present and will produce those documents by next Friday, June 28th. . . .

> As for request no. 29, Defendants do not keep documents showing costs by month for each of the last seven years to market, promote and advertise its goods in the US. Defendants have produced what they maintain in the ordinary course of business. Similarly, as for request no. 30, Defendants do not maintain documents limited exclusively to profits and losses for sales into the United States, rather it has generally been on a worldwide basis. Defendants will amend its responses accordingly.

(Docket Entry 80 at 7-8.)

Defendants further asserted:

> For interrogatories nos. 8 and 10, requests to state for each jurisdiction the suggested or expected wholesale price and retail price (whichever is applicable, or both) of the good or service, specifying the currency if not in U.S. dollars, and to describe the nature and amount of profits derived from the sale in the US of any goods associated with the GRIN mark, by month, "describing with particularity the methodology used to compute or otherwise arrive at each element and the total amount thereof[,]" are better answered through documents requests and/or at deposition. Defendants have objected to these interrogatories to the extent they involve sales

5

outside the US and that the request is overly broad and unduly burdensome and oppressive to the extent it seeks profits by month, and further seeks "methodology used to compute" such profits. *Id.* Defendants intend to produce documents that are responsive to this request on or before June 28th, well in advance of Defendants' noticed deposition.

Plaintiff claims that [Defendants' response to] interrogatory no. 11 — a request to describe all costs and amounts expended by Defendants to promote, market, and advertise goods or services actually or planned or intended to be sold, offered, distributed, provided, or licensed under or in connection with the "GRIN" mark in the United States over the last 7 years — is deficient because the documents identified do not reflect meetings with retailers or communications with contractors. Defendants fail to see how communications would reflect amounts expended. . . . Moreover, Plaintiff has an opportunity to pose these questions to Defendants during deposition.

(Id. at 10-11.)

On June 26, 2024 (see Docket Entry 123, ¶ 4), Defendants produced "Grin's USA Sale Transaction spreadsheet, 2017-2024" (Docket Entry 124, ¶ 4), "which reflects Grin's U.S. sales" (Docket Entry 123, ¶ 4), and which begins with "bates number GRIN_00004567" (Docket Entry 124, ¶ 4). (See Docket Entry 131-2 (the "Sales Spreadsheet" or "Grin 4567") at 2.) Two days later (see Docket Entry 123, ¶ 5), Defendants produced "Grin's USA Expense Transaction spreadsheet, 2017-2024" (Docket Entry 124, ¶ 5), "which reflects Grin's expenses and costs related to its U.S. sales" (Docket Entry 123, ¶ 5), and which begins with "bates number GRIN_00007924" (Docket Entry 124, ¶ 5). (See Docket Entry 131-3 (the "Expense Spreadsheet" or "Grin 7924") at 2.) On July 10,

6

2024, and July 11, 2024, Plaintiff deposed Xiaohang "Tara" Tan individually and as Defendants' Rule 30(b)(6) witness. (See Docket Entry 113-3 at 6, 16, 29-30.) At the deposition, Tan confirmed that the Sales Spreadsheet reflects Defendants' sales in the United States through April 2024. (See id. at 17-19.) Tan further indicated her belief that it includes a profit and loss report that "reflect[ed] all of Grin Natural USA [L]imited income and expenses for 2021 through April of 2024." (Id. at 21.) When asked, "[w]here are the expenses in this table," Tan replied: "The expenses are in here. Because this is a summary of revenue we did it doesn't really have any information about the expenses." (Id. at 21-22.)

Tan further confirmed that the Expense Spreadsheet contains Defendants' expenses. (See id. at 23-24.) When asked about the fact that the Expense Spreadsheet's summary page does not list any expenses related to sales into the United States for the years 2017, 2018, and 2019, and specifically whether it "[i]s . . . accurate that no expenses were attributed to U.S. sales for those years," Tan explained: "[i]t's because before 2019, we didn't split these expenses by different markets and record them." (Id. at 24.) As such, Tan noted, "there were expenses for Grin . . . . New Zealand," "[w]hich is . . . . Grin Natural Products Limited." (Id.) She testified that "[t]here were definitely" expenses for Grin Natural Products Limited, but when asked, "[b]ut none that you

have attributed exclusively to the U.S.," she responded: "[b]ecause we recorded them all under one account because we were really small back then, we didn't have enough human resources or materials to do this." (Id.)

When asked whether the "tab USA Expense Summary[] . . . represent[s] the expenses for Grin Natural USA Limited for the years at least beginning April 2021 through April 2024," Tan responded: "Yes. But I need to emphasize that this does not include the expenses for personal [sic] functions in other markets. So the expenses would only include investment into marketing essentially. And I also need to double check whether this includes the shipping. It looks like it doesn't include shipping." (Id. at 26.) In response, Plaintiff's counsel asked, "would you include shipping expenses in an expense summary for Grin Natural USA Limited," to which question Tan replied, "I need to double check about this." (Id. at 27.)

Thereafter, at the Court's direction (see Text Order dated Aug. 7, 2024), "the parties met and conferred to determine what issues remained unresolved relating to [the M]otion to [C]ompel" (Docket Entry 123, ¶ 6). At that meeting, Defendants "agreed to amend [their ]response to Interrogatory No. 10, among others, to ensure completeness." (Id.) The parties then filed a joint notice "setting out the issues, if any, that remain for resolution by the Court." (Docket Entry 90 (the "Notice") at 1 (internal quotation

marks omitted).)  Per that Notice (filed on August 23, 2024 (<u>see</u> <u>id.</u> at 6)):

> Following the close of briefing on the Motion[ to Compel], Defendants completed a substantial document production of documents by June 28, 2024.  Defendants further supplemented their production on July 10, 2024. Plaintiff accepts Defendants' representations that Defendants' document production is substantially complete at this time.  Following the conclusion of document production, Defendants served a privilege log.  Plaintiff accepts that the privilege log is substantially complete at this time.  Defendants also served their Fourth Amended and Supplemental Interrogatory responses on July 10, 2024.

> Pursuant to the Court's Text Order, the parties met and conferred on August 21, 2024, regarding outstanding issues raised in the [M]otion to [C]ompel.  Plaintiff raised continued concerns with Interrogatory Responses 8, 10, and 12.  Defendants proffered forthcoming supplementation which will resolve Plaintiff's remaining concerns.

> Accordingly, Plaintiff no longer requests that the Court order production of documents and accepts that Defendants' document production is substantially complete.  Plaintiff expects Defendants to continue to comply with their obligations under [Rule] 26 to supplement as necessary, but such supplementation is beyond the scope of the Motion[ to Compel].  Further, Plaintiff accepts Defendants['] assurances of forthcoming supplemental interrogatory responses and assuming such responses are complete prior to any hearing on this matter, Plaintiff no longer requests that the Court order further supplementation of Defendants' interrogatory responses.

(<u>Id.</u> at 2-3.)

On August 26, 2024, Defendants served their "Fifth Supplemental and Amended Responses and Objections" (Docket Entry 109-4 at 2 (all-caps and bold font omitted)) to Plaintiff's written discovery.  (<u>See</u> <u>id.</u> at 19.)  For Interrogatory 10, Defendants

9

identified various documents, including the Sales Spreadsheet and Expense Spreadsheet (see id. at 15), and for Interrogatory 11, Defendants identified material located at three different bates number ranges, which did not include the Sales Spreadsheet or Expense Spreadsheet (see id. at 16).

Meanwhile, in July 2024, Defendants' counsel contacted Julianne "Juli" Saitz at FTI Consulting (see, e.g., Docket Entry 148-1 at 2), asking her "to take a look at" the instant "trademark infringement dispute," as well as to "give [defense counsel Saitz's] thoughts on potential damages." (Docket Entry 113-9 at 16.) Although she considered herself "just a consultant" when she "first spoke with [defense counsel] about the matter," Saitz considered herself "a potentially testifying expert" "by August 9th" (id. at 32), when defense counsel sent her an email indicating that "[t]he [expert] report is due September 2, 2024" (Docket Entry 148-1 at 2). (See Docket Entry 113-9 at 32-33.) Pursuant to the parties' "Stipulated Protective Order and Electronically Stored Information Agreement" (Docket Entry 56 (the "Stipulated Protective Order") at 1 (all-cap and bold font omitted)),

> [e]xcept for non-testifying experts, five (5) business days prior to disclosure to any potential testifying expert, Counsel for the party seeking disclosure of "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL ATTORNEYS [sic] EYES ONLY" information, shall provide, subject to subparagraphs 14 (b-e) to opposing counsel and to any non-party from which the material originated, if applicable, the name, address, and present employer of such expert. Opposing counsel and/or such non-party shall then have a period of five business (5) days after

10

receipt of such information to challenge the disclosure of "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL ATTORNEYS [sic] EYES ONLY" information to such person in this action, by serving a written statement of the challenge upon the party seeking to make such disclosure.

(Id. at 8 (all-cap font in original).)

The Stipulated Protective Order also obliged retained experts to complete a nondisclosure agreement (the "NDA") prior to receiving confidential information. (See id. at 7-8.) Saitz executed the NDA on Wednesday, August 14, 2024 (see Docket Entry 124-5 at 3), and defense counsel transmitted the NDA to Plaintiff's counsel shortly after 9:40 a.m. on Thursday, August 22, 2024, through an email saying "[p]lease find the attached NDA for the [d]efendants' expert" (Docket Entry 111-1 at 2). Approximately one hour later, Plaintiff's counsel sent a response email that, as relevant to the Motions, states:

> This appears to be an attempt to disclose a testifying expert. If that's the case, please provide "the name, address, and present employer of such expert" consistent with the requirements of Para. 14(a) of the protective order in this case. *See* Dkt. 56. Once we have that information, we will consider the 5-day period for review, and if necessary any challenge, to have begun.

(Docket Entry 111-2 at 2.)

Just before noon on Monday, August 26, 2024, defense counsel sent the necessary information, commencing the five-business-day notice period, which, due to the Labor Day holiday, ended on September 3, 2024. (See Docket Entry 111-3 at 2-3.) On Monday, September 2, 2024, Saitz served her expert report (see generally

11

Docket Entry 142-1 (the "Initial Report")), which indicates that Saitz

> ha[s] been retained by [defense counsel] to prepare
> certain analyses in order to assist the Court in
> considering the type and amount of economic damages that
> Plaintiff may recover from [Defendants] should the Court
> find Defendants liable for the various causes of action.
> [She] ha[s] also been retained to prepare certain
> analyses in order to assist the Court in considering the
> type and amount of economic damages that Defendants may
> recover from [Plaintiff] should the Court find
> [Plaintiff] liable under Defendants' counterclaims.

(Id. at 5.) The Initial Report opines solely on Plaintiff's and Defendants' sales (see id. at 2-13) and provides the following "Summary of Opinions" (id. at 6 (all-cap and bold font omitted)):

### A. Counterclaims Asserted by Grin

> 12. Based on my professional experience, it is my
> understanding that should the Court rule in favor of Grin
> in this matter regarding the counterclaims at issue, Grin
> may be entitled to monetary remedies by law. The
> analyses I intend to present are applicable to the claims
> relating to [Plaintiff's] alleged violation of the Lanham
> Act. It is my understanding that pursuant to the Lanham
> Act, if successful in establishing liability, Grin may
> recover both a disgorgement of [Plaintiff's] profits on
> the sale of the products bearing the trademark found
> under the '196 Registration ("Sacks Holdings' Accused
> Products"), and its own actual damages due to
> [Plaintiff's] allegedly infringing conduct, so long as
> such recovery does not constitute an impermissible double
> recovery.

> 13. I have been asked by Counsel at this time to
> prepare an affirmative calculation of [Plaintiff's] sales
> of Sacks Holdings' Accused Products. Sales of Sacks
> Holdings' Accused Products from November 2020 through
> February 2024 are approximately . . . . [S]hould
> [Plaintiff] (or their expert) present calculations
> related to the deduction of costs and expenses related to
> their accused sales, I reserve the right to review and
> comment on such calculations as appropriate.

14. I reserve the right to update and/or supplement my opinions should Plaintiff's expert witness offer a reply to this report or should additional information become available.

**B. Claims Asserted by [Plaintiff]**

15. Based on my professional experience, it is my understanding that should the Court rule in favor of [Plaintiff] in this matter regarding the claims at issue, [Plaintiff] would be entitled to the same monetary remedies by law as Grin under the Lanham Act, including both [Grin's] profits and [Plaintiff's] own actual damages, so long as such recovery does not constitute an impermissible double recovery. These remedies would be based on the sale of the products bearing Grin's trademark under the '028 Registration ("Grin Accused Products").

16. Although it is not yet clear whether [Plaintiff] is pursuing recovery of damages based on an accounting of Grin's profits, I have been asked by Counsel at this time to prepare a preliminary calculation of Grin's profits generated by the Grin Accused Products in the United States from April 2017 through April 2024. I have calculated Grin's sales of the Grin Accused Products to be . . . . I have not received information containing Grin's related and deductible costs as of the date of issuance of this report. Once that information is made available to me I am prepared to update my analysis to calculate Grin's profits.

17. I reserve the right to update and/or supplement my opinions should Plaintiff's expert witness offer a reply to this report or should additional information become available.

(Id. at 6-8 (footnotes omitted) (bold font in original).)

The Initial Report further states:

[I]t is [Plaintiff's] responsibility to prove all elements of costs and deductions being claimed. Nonetheless, I note that as of the date of this report, I have not had the ability to review sufficient documentation to calculate the costs and expenses associated with Sacks Holdings' Accused Products, as it has not been produced. If additional documentation is

13

produced, I am prepared to evaluate it, and if [Plaintiff's] expert submits a calculation of [Plaintiff's] profits, I am prepared to evaluate it to determine proper deducting of the costs and expenses.

(Id. at 10-11.)

In actuality, however, "[o]n August 25, 2024, [Plaintiff had] produced documents responsive to Defendants' discovery requests related to [Plaintiff's] costs, expenses, and profits." (Docket Entry 109-2, ¶ 8.) Thus, in her subsequent deposition, Saitz clarified that "better wording in the [Initial R]eport probably would have been produced to me," as she does not know "if it was produced," only that "it was not produced to [her]." (Docket Entry 113-9 at 37-38.)

According to an affidavit from Plaintiff's counsel,

[b]ased on Defendants' financial information known to [Plaintiff] at the close of fact discovery, and especially in view of the absence of detailed cost and expense information, as well as based on the representations made throughout the course of the litigation regarding Defendants' discovery productions and responses, [Plaintiff] elected not to request its damages expert to provide an initial expert report on September 2, 2024.

(Docket Entry 109-2, ¶ 7.) Instead, on September 27, 2024, Plaintiff produced a rebuttal report from its expert, Graham Rogers. (See Docket Entry 113-6 (the "Rogers Report").) The Rogers Report opines on Plaintiff's sales and profits and Defendants' sales, noting that the Initial Report potentially slightly miscalculates Defendants' sales. (See id. at 2-20.)

14

At 8:12 p.m. on Wednesday, October 30, 2024, Defendants produced a second expert report from Saitz (Docket Entry 142-2) (the "New Report") as well as certain documents (Docket Entry 113-1) (the "New Evidence") that contain "information relied on by [] Saitz in forming her opinions." (Docket Entry 109-7 at 2.) According to the New Report, "[s]ince the date of [her] Initial Report, [Saitz] received and reviewed the profit and loss statements ('P&L') for [Plaintiff] and Grin, as well as additional financial information provided by Grin. [She] also reviewed the [Rogers] Report . . . ." (Docket Entry 142-2 at 4.) The New Report further notes that, "[s]ince the date of issuance of [her] Initial Report[, Saitz] had the opportunity to review P&Ls for Grin US Limited and Grin USA Limited, as well as sales and cost information for TJX sales in the United States that are recorded as part of the Grin Natural Products Limited entity." (Id. at 10.)

Plaintiff deposed Saitz on Monday, November 4, 2024. (See Docket Entry 113-9 at 3.) At her deposition, Saitz indicated that she "ha[d] not" (id. at 12) "spoken with anyone at any of the defendant entities" (id.). As for the New Evidence, Saintz explained that it, inter alia, segregates certain sales linked to the American market in "an attempt to split out financial information" for that market as, "prior to 2020 there was no separate reporting for U.S. sales," but, during that period, "sales into the U.S. could be determined by looking at certain TJX sales,

15

TJ Maxx companies." (Id. at 45.) When asked if she "kn[e]w how the defendants went back to segregate out that financial data," however, Saitz said she did not "know how they did it, specifically." (Id. at 46.) She also did not know when Defendants compiled that information. (See id. at 45.)

According to an affidavit from defense counsel,

[w]hile preparing her initial expert report, [] Saitz noticed that the financial statements previously produced by Grin were missing some costs and expenses associated with the sales of the goods in the U.S. She instructed me that she would consider deducting additional costs from Grin's sales, such as the "costs of goods sold" and freight and shipping fees, but she did not have that information.

After several rounds of back and forth with [] Saitz's team at FTI and Grin's staff, Grin was able to compile updated financial statements that included the detail she required on Grin's expenses and costs for U.S. sales. Grin finished compiling the information [] Saitz requested on October 15, 2024.

(Docket Entry 123, ¶¶ 10-11 (paragraph numbering omitted).)

On Tuesday, November 26, 2024, counsel met and conferred regarding Plaintiff's objections to the New Report and New Evidence. (See id., ¶ 12; Docket Entry 109-2, ¶ 3.) At that meeting, defense counsel "discussed the possibility of making Tara Tan available for another deposition for the limited purpose of answering questions on Grin's updated financial information." (Docket Entry 123, ¶ 12.) Plaintiff's counsel "said he would take it under consideration, but then never indicated that [Plaintiff] wanted to take the deposition." (Id.) Instead, the following

16

week, Plaintiff filed the Motions. (See Docket Entries 108, 110.) Through the Motions, Plaintiff seeks to exclude the New Evidence and strike the New Report. (See id.) Defendants oppose both Motions. (See, e.g., Docket Entries 120, 121.) Shortly after they finished briefing the Motions and associated motions to seal, on the deadline for dispositive motions (see Docket Entry 22 at 3 (reflecting dispositive motion deadline of January 6, 2025)), the parties moved for summary judgment. (See Docket Entries dated Dec. 6, 2024, to Jan. 6, 2025.)

## DISCUSSION

### I. Lanham Act Damages

Under the Lanham Act, when a plaintiff (or counter-plaintiff) establishes infringement of its trademark,

> the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of [Title 15], and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The [C]ourt shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the [C]ourt may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the [C]ourt shall find that the amount of the recovery based on profits is either inadequate or excessive the [C]ourt may in its discretion enter judgment for such sum as the [C]ourt shall find to be just, according to the circumstances of the case.

15 U.S.C. § 1117.

17

In calculating profits for trademark infringement, "[t]he net profits for which the actor is liable . . . are his gross income earned by means of the conduct which subjects him to liability less the allowable costs incurred by him in earning that income." Restatement (First) of Torts § 748 (1938). "When the defendant is shown to have earned income by means of the conduct which subjects him to liability, the burden is on him to establish that this income does not represent his net profits and what deductions should be made in order to ascertain his net profits." Id. cmt. a. "The cost of the material consumed in the manufacture of goods or the performance of services from the disposal of which income was derived and the cost of the mechanical power and the labor involved therein are deductible from the gross income," id. cmt. b, as are "[s]elling costs," including "transportation costs incurred by the seller," id. cmt. c.

## II. Relevant Standards

Under Rule 26, "a party must, without awaiting a discovery request, provide to the other parties," inter alia, "a copy — or a description by category and location — of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses." Fed. R. Civ. P. 26(a)(1)(A)(ii). "In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity

18

of any [expert] witness it may use at trial to present evidence
. . . ." Fed. R. Civ. P. 26(a)(2)(A). "Unless otherwise
stipulated or ordered by the [C]ourt, this disclosure must be
accompanied by a written report — prepared and signed by the
witness — if the witness is one retained or specially employed to
provide expert testimony in the case . . . ." Fed. R. Civ. P.
26(a)(2)(B). "The report must contain: (i) a complete statement of
all opinions the witness will express and the basis and reasons for
them[ and] (ii) the facts or data considered by the witness in
forming them . . . ." Id. "A party must make these disclosures at
the times and in the sequence that the [C]ourt orders." Fed. R.
Civ. P. 26(a)(2)(D). Additionally, "[t]he parties must supplement
these disclosures when required under Rule 26(e)." Fed. R. Civ. P.
26(a)(2)(E).

"A party who has made a disclosure under Rule 26(a) — or who
has responded to an interrogatory, request for production, or
request for admission — must supplement or correct its disclosure
or response," inter alia, "in a timely manner if the party learns
that in some material respect the disclosure or response is
incomplete or incorrect, and if the additional or corrective
information has not otherwise been made known to the other parties
during the discovery process or in writing." Fed. R. Civ. P.
26(e)(1)(A). "For an expert whose report must be disclosed under
Rule 26(a)(2)(B), the party's duty to supplement extends both to

19

information included in the report and to information given during the expert's deposition." Fed. R. Civ. P. 26(e)(2). Further,

> [i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1). "In addition to or instead of this sanction, the [C]ourt, on motion and after giving an opportunity to be heard" may, inter alia, "order payment of the reasonable expenses, including attorney's fees, caused by the failure" and "impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi)." Fed. R. Civ. P. 37(c)(1)(A) & (C).

As the United States Court of Appeals for the Fourth Circuit has noted,

> Rule 26 disclosures are often the centerpiece of discovery in litigation that uses expert witnesses. A party that fails to provide these disclosures unfairly inhibits its opponent's ability to properly prepare, unnecessarily prolongs litigation, and undermines the district court's management of the case. For this reason, [the Fourth Circuit] give[s] particularly wide latitude to the district court's discretion to issue sanctions under Rule 37(c)(1).

Wilkins v. Montgomery, 751 F.3d 214, 221 (4th Cir. 2014) (internal quotation marks omitted). However:

> [I]n exercising its broad discretion to determine whether a nondisclosure of evidence is substantially justified or harmless for purposes of a Rule 37(c)(1) exclusion analysis, a district court should be guided by the following factors: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of

20

that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir. 2003). The first four "factors — surprise to the opposing party, ability to cure that surprise, disruption of the trial, and importance of the evidence — relate mainly to the harmlessness exception, while the remaining factor — explanation for the nondisclosure — relates primarily to the substantial justification exception." Id. "The burden of establishing these factors lies with the nondisclosing party." Wilkins, 751 F.3d at 222. In deciding whether to exclude evidence under Rule 37(c), district courts "[are] not *required* to tick through each of the *Southern States* factors." Id. (emphasis in original).

Separately, "[o]n motion or on its own, the [C]ourt may issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)-(vii), if a party or its attorney," inter alia, "fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f)(1)(C). "Instead of or in addition to any other sanction, the [C]ourt must order the party, its attorney, or both to pay the reasonable expenses — including attorney's fees — incurred because of any noncompliance with this [R]ule, unless the noncompliance was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 16(f)(2). "The Court has broad

21

discretion in employing sanctions." <u>Akeva L.L.C. v. Mizuno Corp.</u>, 212 F.R.D. 306, 311 (M.D.N.C. 2002). Nevertheless, "[p]reclusion of the introduction of untimely disclosed information is the 'baseline rule' in the ordinary case." <u>Thomasville Furniture Indus., Inc. v. Pulaski Furniture Corp.</u>, No. 1:09cv591, 2011 WL 13239926, at *2 (M.D.N.C. Dec. 1, 2011). In assessing sanctions for noncompliance with a pretrial scheduling order, courts consider various factors, including "(1) the explanation for the failure to obey the order; (2) the importance of the expert opinion; (3) the prejudice to the opposing party by allowing the disclosures; and (4) the availability of alternative or lesser sanctions," as well as (5) "the interest in expeditious resolution of litigation; ([6]) [the C]ourt's need to manage its docket; and ([7]) public policy favoring disposition of cases on the merits." <u>Akeva</u>, 212 F.R.D. at 311. Notably, "[t]he factors involving docket control planning are sufficiently important to alone justify the exclusion of an untimely disclosed expert report or opinion even in absence of prejudice to the opposing party." <u>Id.</u>

### III. New Evidence

Defendants maintain that the New Evidence constitutes a timely supplementation or, alternatively, that it "was substantially justified or harmless" (Docket Entry 120 at 16 (bold and capitalized font omitted)). (<u>See</u> <u>id.</u> at 1-23.) Those contentions lack merit.

22

As an initial matter, Defendants seem to suggest that their objections to the relevant discovery requests somehow justified their disclosure of the New Evidence after fact discovery closed. (See, e.g., id. at 4-5 (emphasizing objections to relevant discovery requests), 14 ("Sacks wrongly seems to believe that its requests for financial information in fact discovery entitled it to every financial detail available in Grin's records without regard to the standards governing fact discovery, such as those concerning burden, proportionality, and reasonableness, and without regard to Grin's specific objections to the discovery demands. Here, Grin objected to Sacks' requests on grounds of vagueness and burden. Grin also objected to the requests to the extent they required the creation of documents not kept in the ordinary course of Grin's business."), 15 ("Without waiving those objections, Grin still conducted a diligent search of its financial records to produce responsive financial documents.").) This argument misses the mark.

As most relevant to the Motions, Plaintiff sought information regarding Defendants' profits throughout the discovery period, including in particular through Interrogatory 10 and Request 30. As noted above, Interrogatory 10 required identification of profits "derived from the sale in the United States of any goods under or in association with the 'GRIN' mark, by month" (Docket Entry 109-4 at 14) and Request 30 required production of "[d]ocuments sufficient to show, by month for each of the last seven years, all

23

profits realized by any Defendant . . . based on the . . . sale of goods . . . in connection with the 'GRIN' mark in the United States" (Docket Entry 124-1 at 21-22). In addition to a litany of "General Objections" that purportedly "apply to each of the discovery requests" (Docket Entry 124-1 at 3; <u>see also</u> Docket Entry 109-4 at 3 ("Grin makes the following general objections . . ., which apply to all the Interrogatories.")), Defendants provided the following responses to Interrogatory 10 and Request 30:

> **Response to Interrogatory No. 10:** Defendants object to this Interrogatory as vague and ambiguous to the extent it uses the terms "nature and amount of profits" without defining the terms and requiring Defendants to speculate about what information is responsive to Plaintiff's interrogatory. Defendants further object to this request as overly broad and unduly burdensome and oppressive to the extent it seeks profits by month, and further seeks "methodology used to comput" [sic] such profits. Further, Defendants object to this Interrogatory as overly broad to the extent it consists of at least 2 discrete (2) subparts. Subject to and without waiving the foregoing objections, Defendants respond to this Interrogatory as follows:

> Defendants will produce, to the extent any exist, non-privileged documents in its [sic] possession, custody or control from which the answer to this Interrogatory can be determined, pursuant to Fed. R. Civ. P. 33(d). Defendants will supplement their response to this Interrogatory with the identification of the production range for any documents produced that are responsive to this Interrogatory.

> **Supplemental Response to Interrogatory No. 10:** Bates Nos. GRIN_00000112-GRIN_00000171

> **Second Supplemental Response to Interrogatory No. 10:** Bates Nos. GRIN_00003092, GRIN_00003146, GRIN_00003214, GRIN_00004567, GRIN_00007924

(Docket Entry 109-4 at 14-15 (bold font in original).)

**Response to Request No. 30:** Grin objects to this request on the grounds that it is overbroad, unduly burdensome, harassing, and seeks documents which are irrelevant and not proportionate to the needs of the case insofar as it seeks the last seven years of profits. Grin objects to this request on the grounds that it seeks discovery of confidential commercial, business, proprietary or competitively sensitive information regarding internal business practices.

Subject to and without waiving the foregoing objections, Grin will produce non-privileged documents in its custody and/or control responsive to this request.

(Docket Entry 124-1 at 22 (bold font in original).)

Defendants' discovery responses and objections suffer from serious defects, "including assertion of impermissible general and boilerplate objections, provision of answers 'subject to and without waiving' said objections, and failures to 'state whether any responsive materials [were] being withheld on the basis of any objection,'" Glaston Corp. v. Salem Fabrication Techs. Grp., Inc., No. 1:21cv942, 2024 WL 3161621, at *8 (M.D.N.C. June 25, 2024) (brackets omitted) (quoting Fed. R. Civ. P. 34(b)(2)(C)). (See Docket Entries 109-4, 124-1.) "As this Court has previously explained, general or 'boilerplate' objections to discovery requests are invalid. Similarly, promising to provide documents 'subject to' objections is improper." Glaston, 2024 WL 3161621, at *8 (brackets, ellipses, and certain internal quotation marks omitted); see also Brown v. Experian Info. Sols., Inc., No. 3:16cv670, 2017 WL 11632852, at *2 (E.D. Va. Apr. 17, 2017) (explaining that "the practice of providing answers 'subject to'

25

objections is confusing and misleading" and "amounts to no answer at all, for it says, essentially, 'here is some information, but there could be more that you are not getting'" (certain internal quotation marks omitted)).

Further, although "it is not *per se* unreasonable for a party to object on the basis that a request is overly broad, burdensome, or seeks irrelevant information, the objecting party has an obligation to show specifically why responding to the request would create a burden or how the request is overly broad in relation to the claims and defenses presented in the litigation." <u>Patrick v. Teays Valley Trs., LLC</u>, 297 F.R.D. 248, 256 (N.D. W. Va. 2013). Moreover, a party objecting on vagueness grounds bears "the burden of explaining the specific and particular way in which each request is vague after exercising reason and common sense to attribute ordinary definitions to terms and phrases utilized in the requests and, if necessary, including any reasonable definition of the term or phrase at issue." <u>Brown</u>, 2017 WL 11632852, at *3 (brackets and internal quotation marks omitted). Defendants have not satisfied either burden.

To begin, it has long been established that, in ascertaining damages for trademark infringement, a defendant may be able to deduct from its revenue certain "joint expenses," but "[t]he apportionment made on the defendant's books is not necessarily determinative," as "[a]ccountants may use one of several methods in

26

apportioning such expenses, the choice depending largely on the needs or convenience of the particular business." Restatement (First) of Torts § 748 (1938) cmt. i. Importantly, though,

> the apportionment in an accounting for profits under the rule stated in this Section is made on a special basis determined by the theory of the liability for profits. The purpose of the apportionment is not business convenience or business policy but an accounting by the wrongdoer for the total gains from his wrongdoing. Consequently the accounting for profits seeks to determine as accurately as possible what part of the joint expenses was incurred in the manufacture or marketing of the infringing goods and what part would have been incurred if the infringing goods had not been manufactured or marketed. If the manufacture and marketing of the infringing goods causes no increase in the general expense, no part of it is to be allocated to them, even though such a practice would be bad from the point of view of cost accounting or business policy. Only when the manufacture or marketing of the infringing goods increases the joint expenses is it proper to allocate a part of them to these goods.

Id. Accordingly, the accounting method employed in calculating profits bears clear relevance to calculation of profits for purposes of a trademark infringement claim. See, e.g., id.; see also Carter Prods., Inc. v. Colgate-Palmolive Co., 214 F. Supp. 383, 389, 400-07 (D. Md. 1963) (analyzing profit calculation dispute arising from differing accounting methods), opinion adhered to on denial of reh'g, No. 6924, 1963 WL 105143 (D. Md. Mar. 5, 1963).

Additionally, "it is undisputed" both "that the plaintiff, Sacks, filed an application to register the 'Grin' mark on August 1, 2017" and "that[,] on two separate occasions before August 1,

27

2017, defendant Grin Natural Products Limited shipped a few tubes of toothpaste and a couple of toothbrushes to customers in the United States who ordered the items from the Grin Natural's New Zealand (.nz) website." (Docket Entry 202 at 2 (citing document "showing sales on April 16, 2017, and July 13, 2017").) It is further undisputed that Defendants had "two other small sales to the same U.S. customer in 2017 after . . . [P]laintiff's trademark filing, both from its website." (Id. at 4.) The parties conducted fact discovery in this case between February 29, 2024, and August 30, 2024 (see, e.g., Docket Entry 22 at 1-2), roughly seven years after the alleged infringement began. Defendants' assertion that Request 30 "is overbroad, unduly burdensome, harassing, and seeks documents which are irrelevant and not proportionate to the needs of the case insofar as it seeks the last seven years of profits" (Docket Entry 124-1 at 22) thus warrants no relief.

Similarly, Defendants have not shown why providing profits by month and explaining the methodology used to compute such profits qualifies as "overly broad and unduly burdensome and oppressive" (Docket Entry 109-4 at 14) in a trademark infringement case. Nor have they explained why, using "reason and common sense," Brown, 2017 WL 11632852, at *3 (internal quotation marks omitted), "the terms 'nature and amount of profits'" in Interrogatory 10 qualify as "vague and ambiguous" (Docket Entry 109-4 at 14). Moreover, Defendants have not shown why, given the Stipulated Protective

28

Order, Request 30 qualifies as objectionable even assuming that it "seeks discovery of confidential commercial, business, proprietary or competitively sensitive information regarding internal business practices" (Docket Entry 124-1 at 22). Defendants also failed to "state whether any responsive materials are being withheld on the basis of th[eir] objection[s]," Fed. R. Civ. P. 34(b)(2)(C), to Request 30. (See Docket Entry 124-1 at 22.)

"By failing to present valid objections to these discovery requests, [Defendants] waived any legitimate objection they may have had." <u>Kinetic Concepts, Inc. v. ConvaTec Inc.</u>, 268 F.R.D. 226, 247 (M.D.N.C. 2010) (brackets and internal quotation marks omitted). Defendants thus cannot rely on their discovery objections to justify their belated production of the New Evidence (or New Report (<u>see</u> Docket Entry 121 at 13 n.3 (noting that Defendants objected to discovery requests))).

Defendants next assert that they lacked awareness about the missing expenses and promptly supplemented their discovery responses when their retained expert alerted them to this omission. (<u>See, e.g.</u>, Docket Entry 120 at 2 ("Sacks apparently believes that Grin: knew its costs, expenses, and profits for its U.S. sales during the fact discovery period; hid this information despite this knowledge; misrepresented to the Court its knowledge of this financial information; and then, in an apparent effort to gain some sort of unclear advantage, suddenly revealed the financial

29

information at issue during the expert discovery period. This is not what happened. As shown by the declarations filed with this opposition, Grin did not know how to derive the sort of technical financial information required to show U.S. profits until it received guidance from . . . Saitz and her team . . . . Once Grin was in possession of that information, it timely disclosed it as required by Rule 26(e) . . . ."), 14 ("By the plain language of [Rule] 26(e), Grin fulfilled its obligations and timely produced the [New Evidence] once it became aware that it had new and complete financial information."), 22 ("Grin needed the guidance of its damages expert to understand what additional cost and expense information to collect.").)

In Defendants' view, "Sacks claims that [Defendants' discovery] efforts were not good enough because ultimately Grin learned that there existed other categories of costs and expenses not accounted for in the financial records produced during fact discovery. But certainly Grin was not aware that these other cost and expense details were missing." (Id. at 15.) According to Defendants:

> While preparing her initial expert report, [] Saitz noticed that the financial statements previously produced by Grin were missing some costs associated with the sales of the goods in the U.S. She instructed Grin's counsel that she would consider deducting additional costs from Grin's sales, such as the "costs of goods sold" and freight and shipping fees, but she did not have that information. After several rounds of back and forth with [] Saitz's team at FTI and Grin's staff, Grin was able to compile updated financial statements that included the

30

> detail she required on Grin's expenses and costs for U.S.
> sales.  Grin finished compiling the information [] Saitz
> requested on October 15, 2024.

(Id. at 11 (citations omitted) (citing Docket Entry 123, ¶¶ 10-11).)  This argument warrants no relief.

To begin, Defendants' discovery productions omitted basic information — "'costs of goods sold' and freight and shipping fees" (Docket Entry 123, ¶ 10) — long identified as potentially deductible expenses in ascertaining profits for a trademark infringement claim, see, e.g., Restatement (First) of Torts § 748, cmts. a-c (1938), not esoteric information whose relevance remained unknown until they "received guidance from [their] damages expert" (Docket Entry 120 at 2).  Moreover, despite their protestations to the contrary, Defendants knew about the omission of this information at least seven weeks before fact discovery closed. (See, e.g., Docket Entry 113-3 at 26 (Defendants' Rule 30(b)(6) witness testifying in early July 2024 that Expense Spreadsheet "looks like it doesn't include shipping").)  Further, the fact that Defendants did not create the New Evidence until after fact discovery closed does not excuse their failure to timely provide the information contained therein to Plaintiff in response to Interrogatory 10, which obliged Defendants to "[i]dentify and describe the nature and amount of profits derived from the sale in the United States of any goods under or in association with the

31

'GRIN' mark" (Docket Entry 52-1 at 8-9).[2]  Explaining that the absence of expenses "attribut[able] to U.S. sales" in various years arose from Defendants' bookkeeping practices, in which "[they] didn't split the[ir] expenses by different markets and record them" (Docket Entry 113-3 at 24), rather than a mere oversight in their production, Defendants repeatedly represented to Plaintiff and the Court that they had fully produced the information responsive to, inter alia, Interrogatory 10 and Request 30 (see, e.g., Docket Entry 90 at 2-3).

In sum, the New Evidence does not qualify as supplementation under Rule 26.  See Therapure Biopharma Inc. v. DynPort Vaccine Co., LLC, Civ. Action No. 19-2092, 2021 WL 2719060, at *2 (D. Md. June 30, 2021) ("Rule 26(e) imposes a requirement to supplement; it does not create a right to produce information in a belated fashion." (internal quotation marks omitted)).  Defendants alternatively maintain that their belated production of the New Evidence qualifies as substantially justified or harmless.  That contention misses the mark.

_____

2  Notably, the New Evidence appears to qualify as evidence subject to disclosure under Rule 26(a), which would have required its disclosure by March 8, 2024, had it then existed.  See Fed. R. Civ. P. 26(a)(1)(A)(ii).  In any event, absent an extension, Defendants needed to produce the information contained therein in response to Interrogatory 10 no later than April 1, 2024.  See Fed. R. Civ. P. 33(b)(2) ("The responding party must serve its answers and any objections within 30 days after being served with the interrogatories.").

As an initial matter, Defendants have not demonstrated substantial justification for their belated production of the New Evidence. According to Defendants:

> For the reasons explained above, Grin did not realize it had omitted some categories of expenses from its financial documents until it learned from [] Saitz what additional information she would seek. After several rounds of back and forth, Grin was able to derive the information [] Saitz requested and supplied it to her. Two weeks later, Grin produced the [New Evidence] to Sacks with [] Saitz's supplemental expert report. The omission of the additional cost and expense information from the financial statements produced in fact discovery was inadvertent. This explanation provides substantial justification for any delay.

(Docket Entry 120 at 21.) For the reasons discussed above, that argument lacks merit.

Defendants likewise fail to establish harmlessness. According to Defendants, the New Evidence "should have come as no surprise to Sacks" because (i) Defendants objected to Plaintiff's discovery requests, (ii) during her deposition, "Tan signaled that Grin's P&L statements may still not include every expense," and (iii) the Initial Report "included an explicit disclaimer that [Saitz] was still waiting on supplemental financial information." (Id. at 17.) This argument "misunderstands the nature of 'surprise' in this context, which comes not from learning [that Defendants incurred expenses related to their U.S. sales], but from learning that [Defendants] intend[] to use [those previously undisclosed expenses] in support of [their] version of the facts." Intercollegiate Women's Lacrosse Coaches Ass'n v. Corrigan Sports

33

Enters., Inc., 694 F. Supp. 3d 625, 652 (M.D.N.C. 2023). "Here, [Plaintiff] clearly faces surprise if [Defendants] could present evidence of [previously undisclosed expenses]." Intercollegiate Women's Lacrosse Coaches Ass'n v. Corrigan Sports Enters., Inc., 698 F. Supp. 3d 814, 819 (M.D.N.C. 2023) ("IWLCA"). "Further, [Plaintiff] took steps during discovery to procure this [evidence], but to no avail, even though the burden was solely on Defendants to disclose it." Id. at 819-20; see also 15 U.S.C. § 1117 ("In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."). "This suggests an inability to cure on the part of [Plaintiff]." IWLCA, 698 F. Supp. 3d at 820.

Defendants maintain, though, that "Sacks has ample time to cure any surprise due to the [New Evidence]" (Docket Entry 120 at 18), on the theory that "Sacks has had a reasonable opportunity to prepare for cross examination and arrange for expert testimony from its rebuttal expert, [] Rogers" (id.) and Defendants' counsel "also discussed making [] Tan available for a deposition on the updated financial statements" (id. at 18 n.5). First, Defendants provided the New Evidence less than three business days before Saitz's deposition (see Docket Entry 109-7 at 2; Docket Entry 113-9 at 3), and at that deposition, Saitz confirmed that she had not discussed the New Evidence with Defendants (see Docket Entry 113-9 at 12) and did not know how Defendants compiled that information (see id. at

34

46), seriously compromising Plaintiff's ability to test the validity of the New Evidence and Saitz's associated calculations. Defendants also provided the New Evidence nearly two months after the initial expert report deadline and more than a month after the rebuttal expert report deadline, belying their assertion that Plaintiff possessed "a reasonable opportunity" (Docket Entry 120 at 18) to "arrange for expert testimony" (id.), particularly given that Plaintiff decided to forego its own initial expert report because of the simplicity of calculating Defendants' financial position based on the evidence that Defendants produced during fact discovery (see Docket Entry 109-2, ¶ 7). Finally, "discuss[ing] the possibility" — two days before Thanksgiving, the week before the close of expert discovery, and just over a month before the deadline for dispositive motions — "of making [Defendants' Rule 30(b)(6) witness] available for another deposition for the limited purpose of answering questions on Grin's updated financial information" (Docket Entry 123, ¶ 12) does not cure the surprise of this belated disclosure, particularly given that Plaintiff had already conducted the only deposition of Saitz allowed under the Scheduling Order (see Docket Entry 22 at 3).

Defendants next maintain that the New Evidence will not disrupt the trial, asserting that it does not impact Defendants' damages theory and only provides more details on issues where Defendants bear the burden. (See Docket Entry 120 at 19-20 ("Sacks

35

claims that the [New Evidence] has 'shifted the entire damages allegations in this case.' Not so. Sacks has been on notice that [Defendants] seek[] disgorgement of Sacks' profits since the filing of the Counterclaims. Neither the [New Evidence] nor [New Report] changes [that] damages theory. All the [New Evidence] does is provide more detail on [Defendants'] costs and expenses — the very elements that [Defendants] bear[] the burden to prove." (brackets and citations omitted)).) As for the importance factor, Defendants assert, in full:

> The [New Evidence] is important as it speaks to [Defendants'] damages, but for the reasons discussed above, the [New Evidence] concerns costs and expenses that [Defendants] bear[] the burden to prove at trial and goes to the fullness of the damages assessment. It does not change any theory in the case.

(Id. at 20.)

According to Saitz's calculations, the New Evidence would yield more than a four-fold reduction in the damages that Plaintiff could recover for Defendants' revenue. (Compare Docket Entry 142-1 at 7 (calculating Defendants' sales), with Docket Entry 142-2 at 13 (calculating Defendants' profits by subtracting expenses from sales).) This evidence thus qualifies as important, but "importance cuts in both directions here, as admission of important undisclosed evidence prejudices [Plaintiff] as well," IWLCA, 698 F. Supp. 3d at 820. See also Southern States, 318 F.3d at 598-99 ("The fact that the expert's testimony regarding the paint formula might have been helpful to [the plaintiff's] case in the eyes of

36

the jury also points out why it should have been disclosed in a timely manner to [the defendant].").  Moreover, "[a]llowing the [New E]vidence would . . . delay and disrupt trial[, currently scheduled for August 4, 2025 (see Docket Entry 195 at 1),] by requiring further time for [Plaintiff] to assess how to meet this evidence and further discovery," IWLCA, 698 F. Supp. 3d at 820, as well as the reopening of the expert discovery period to allow Plaintiff to obtain an initial expert report from its damages expert in light of the upending of its understanding of Defendants' financial situation.

Defendants thus fail to establish either harmlessness or substantial justification for their belated production of the New Evidence.[3]  As such, Defendants may not "use th[e New Evidence] to supply evidence on a motion, at a hearing, or at [the] trial." Fed. R. Civ. P. 37(c)(1).[4]

**IV. New Report**

Defendants similarly contend that the New Report qualifies as a "timely and proper" supplementation. (Docket Entry 121 at 2; see id. at 1-18.)  As Defendants tell it, "after submitting her

--------

3  This conclusion moots Plaintiff's alternative request for sanctions.  (See Docket Entry 109 at 22 ("Even if the Court concludes that Defendants' untimely disclosure was harmless or substantially justified under the [Rules], the Court should still exclude this evidence under its inherent authority based on Defendants' course of conduct during discovery and past misrepresentations regarding this evidence.").)

4  Thus, Saitz cannot rely on the New Evidence either.

original expert report, Saitz received information regarding both parties' costs and expenses that made her initial calculations as to damages incomplete. In such circumstances, [Rule] 26(e) does not just permit supplementation — it requires it." (Id. at 9.) In the alternative, Defendants maintain that, "[e]ven if this Court finds there has been a violation of [Rule] 26(e) and/or [Rule] 16(f), [Defendants] ha[ve] shown good cause." (Id. at 13.) These assertions lack merit.

Rule 26(e) requires a party to "supplement or correct its disclosure or response . . . if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A) (emphasis added).[5] Notably, "[R]ule [26] does not create a right to produce information in a belated fashion." EEOC v. Freeman, 961 F. Supp. 2d 783, 797 (D. Md. 2013) (internal quotation marks omitted), aff'd sub nom. E.E.O.C. v. Freeman, 778 F.3d 463 (4th Cir. 2015); accord Reid v. Lockheed Martin Aeronautics Co., 205 F.R.D. 655, 662 (N.D. Ga. 2001) ("In short, Rule 26 imposes a *duty* on [parties]; it grants them no *right* to produce information in a belated fashion."

---

5 "[A] disclosure is incomplete or incorrect in some material respect if there is an objectively reasonable likelihood that the additional or corrective information could substantially affect or alter the opposing party's trial preparation . . . ." North Carolina State Conf. of the NAACP v. Cooper, No. 1:18cv1034, 2024 WL 1860243, at *4 (M.D.N.C. Apr. 29, 2024) (ellipsis and internal quotation marks omitted), opinion clarified sub nom. North Carolina State Conf. of the NAACP v. Hirsch, No. 1:18cv1034, 2024 WL 1974504 (M.D.N.C. May 4, 2024).

38

(emphasis in original)). "Supplementation of an expert report permits a party to correct inadvertent errors or omissions. Supplementation, however, is not a license to amend an expert report to avoid [an adverse ruling]." Gallagher v. Southern Source Packaging, LLC, 568 F. Supp. 2d 624, 630 (E.D.N.C. 2008); see also Akeva, 212 F.R.D. at 310 ("Plaintiff does not argue that Mr. Fredericksen's initial opinion was incorrect, but appears to argue that it was incomplete. The Court cannot accept a definition of supplementation which would essentially allow for unlimited bolstering of expert opinions.").

"Courts distinguish 'true supplementation' (e.g., correcting inadvertent errors or omissions) from gamesmanship, and have therefore repeatedly rejected attempts to avert [an adverse ruling] by 'supplementing' an expert report with a 'new and improved' expert report." Gallagher, 568 F. Supp. 2d at 631; see also, e.g., Thomasville Furniture, 2011 WL 13239926, at *2 ("In this case, the June 8 supplemental report is not a proper supplemental report pursuant to Rule 26(e). [The d]efendant is not attempting to correct the original expert report because it is misleading. Rather, [the d]efendant seeks to add information that is missing from the original report."). "To construe Rule 26(e) supplementation to apply whenever a party wants to bolster or submit additional expert opinions would wreak havoc [o]n docket control and amount to unlimited expert opinion preparation."

39

<u>Campbell v. United States</u>, 470 F. App'x 153, 157 (4th Cir. 2012)

(brackets and internal quotation marks omitted); <u>accord</u> <u>Akeva</u>, 212

F.R.D. at 310.

>According to Defendants,
>
>>[they] fulfilled [their] obligations and timely served
>>Saitz's [New] Report, under [Rule] 26(e), before the
>>close of expert discovery and prior to Saitz's
>>deposition, because [the New Report] relied upon new and
>>complete financial information that was material to
>>Saitz's [I]nitial [R]eport. Saitz's [New] Report is
>>therefore proper. Since there was no violation of [Rule]
>>26(e), there can be no violation of the [Joint Rule]
>>26(f) Report and no [Rule] 16(f) violation of the
>>[S]cheduling [O]rder.
>
>>Sacks, however, seeks to subvert the plain language
>>of [Rule] 26(e) by characterizing the [New] Report as
>>offering "new" opinions. ECF No. 114 at 16-18. Such a
>>statement has no basis in reality. Saitz's [New] Report
>>is a clear continuation of the analysis presented in
>>Saitz's Initial Report. In her Initial Report, Saitz
>>establishes [Defendants'] intent to seek disgorgement of
>>profits and opines on the parties' total sales — a
>>necessary step to calculate profits — based on the
>>information she had to date. She makes clear that if she
>>received further information on the parties' deduction of
>>costs and expenses related to their sales, she would
>>update her analysis. ECF No. 113-5 at 9-10. Her [New]
>>Report updates her earlier profits calculations with new
>>information provided to her regarding costs and expenses
>>derived by the parties, referencing her Initial Report
>>throughout. ECF No. 113-8. Saitz's [New] Report does
>>not offer "new opinions." The report simply offers more
>>details on her prior calculations.

(Docket Entry 121 at 8-9.) This argument misses the mark.

To begin, as Defendants tacitly concede, the Initial Report

opines solely on the parties' <u>sales</u>, whereas the New Report

additionally opines on the parties' <u>profits</u>. (<u>See</u> Docket Entries

142-1, 142-2.) Thus, the New Report offers "new opinions" and

40

calculations; it does not merely "offer[] more details on [Saitz's] prior calculations" (Docket Entry 121 at 9 (internal quotation marks omitted)) or otherwise supplement her prior opinions. That Saitz allegedly lacked the information "needed to complete her opinion" (id. at 11; see id. ("This is not a situation where the information or know-how Saitz needed to complete her opinion was in her control, as in *Akeva* or *Thomasville Furniture Industries*. In this case, the documents that Saitz needed to complete her opinion were not available to her at the time of the Initial Report due to the timing of events discovery and other factors.")) until after the Initial Report deadline does not salvage her New Report under Rule 26(e). Rule 26(e) requires supplementation "<u>if the party learns</u> that in some material respect the disclosure or response is incomplete or incorrect," not <u>if an expert learns</u> of such situation. Fed. R. Civ. P. 26(e)(1)(A) (emphasis added). As discussed above, prior to the expert report deadline, Defendants knew (i) that they lacked information regarding their U.S. expenses, (ii) that they had not provided Saitz with necessary information — which Defendants possessed — regarding Plaintiff's expenses, and thus (iii) that Saitz could opine only on sales, not profits, in her expert report. As such, the New Report does not qualify as a Rule 26(e) supplementation.

"Because [the New R]eport is not authorized under Rule 26(e), it is an untimely expert report and violates Rule 26(a)(2)(D) and

the Court's pretrial [S]cheduling [O]rder. Rule 16(f) is therefore implicated." Thomasville Furniture, 2011 WL 13239926, at *2. Defendants maintain, however, that they "ha[ve] shown good cause" for the belated disclosure. (Docket Entry 121 at 13.) Defendants offer three grounds for this assertion. (See id. 13-14.)

"First," Defendants contend, "once [they] retained Saitz as a testifying expert, [they] honored the five-day waiting period for Sacks to raise any objections to Saitz's review of Sacks [sic] financial statements designated as [attorney's eyes only] before sending that information to Saitz, as per the Stipulated Protective Order," during which period "the deadline for initial expert reports . . . passed." (Id. at 13.) In Defendants' view, they "did what [they] could do in that situation: [they] timely submitted Saitz's Initial Report relying on information that Saitz had previously reviewed while also adhering to the terms of the Stipulated Protective Order." (Id.) This argument warrants no relief, as regardless of whether Defendants should have officially "retained Saitz as a testifying expert" (id.) earlier in the discovery process, Defendants retained Saitz as a testifying expert by August 22, 2024 (see Docket Entry 111-1 at 2). Defendants just failed to provide the (basic) information necessary to begin the five-day objection window until August 26, 2024 (see Docket Entry 111-2 at 2; Docket Entry 111-3 at 2-3), a delay that extended the objection window beyond the expert report deadline (see Docket

Entry 22 at 2). Defendants' own dilatory actions do not establish good cause.[6]

"Second," Defendants maintain, they "created new financial statements after receiving guidance from Saitz on the details of costs and expense information necessary from deduction of sales to determine profits. That effort took until October." (Docket Entry 121 at 14 (citation omitted).) For all the reasons discussed above regarding Defendants' improper post-fact-discovery production of the New Evidence, this argument does not show good cause. "Third," Defendants assert, they "did not receive a copy of [] Chodorow's final deposition transcript until after the deadline for Saitz's initial report. Saitz relied on [] Chodorow's transcript extensively in the [New] Report to understand Sacks' financial statements." (Id. (emphasis added); see also id. at 6 (asserting that "Chodorow's final deposition transcript . . . became available after September 2" (emphasis added)).) Defendants provide no evidence regarding the date when Chodorow's deposition transcript became available (see id. at 6, 14; see also Docket Entries 123, 124), let alone evidence that the only version of Chodorow's deposition transcript became available after the expert report deadline. See, e.g., United States v. White, 366 F.3d 291, 300

_____

6 That Defendants started collaborating with Saitz in July 2024 and entertained designating her as a testifying expert by August 9, 2024, merely reinforces the responsibility that Defendants bear for Saitz's inability to review Plaintiff's financial information prior to the expert report deadline.

43

(4th Cir. 2004) (explaining that "an attorney's unsworn argument does not constitute evidence"); Bayer CropScience Inc. v. Syngenta Crop Prot., LLC, No. 1:13cv316, 2013 WL 12137000, at *1 (M.D.N.C. Dec. 12, 2013) (observing that "[s]tatements in a brief are not evidence").[7]  Accordingly, Defendants have not established good cause for their untimely disclosure of the New Report.

"Having found a violation of Rule 16(f), the next issue is what kind of sanctions to impose, if any." Akeva, 212 F.R.D. at 311.  Defendants maintain that "the *Aveka* [sic] factors weigh in [their] favor" and thus that "the Court should still permit the [New] Report pursuant to the *Aveka* [sic] factors."  (Docket Entry 121 at 14 (bold and capitalized font omitted).)  This argument falls short.

For the first factor, their "explanation for the failure to obey the [Scheduling O]rder," Akeva, 212 F.R.D. at 311, Defendants assert solely that they "ha[ve] provided a good faith explanation for the timing of the [New] Report, as discussed in [the] section [of their memorandum dealing with good cause]" (Docket Entry 121 at

---

7  It also bears mention that the five-day objection window likely would have precluded Saitz's review of Chodorow's deposition testimony prior to the expert report deadline, given Defendants' contention that "Saitz relied on [] Chodorow's transcript extensively in the [New] Report to understand Sacks' financial statements" (Docket Entry 121 at 14), which Saitz could not review until after the expert report deadline.  Thus, the timing of Defendants' receipt of "Chodorow's final deposition transcript" (id.) appears to have little, if any, impact on Saitz's inability to opine on Plaintiff's profits in the Initial Report.

14).  As discussed above, that contention lacks merit.  Regarding the second factor, "the importance of the expert opinion," Akeva, 212 F.R.D. at 311, Defendants assert:  "the [New] Report is important to [Defendants'] case as it supports [their] claim for damages and goes to the fullness of the damages assessment.  Without Saitz's [New] Report, [Defendants] may not be able to satisfy [their] burden to prove [their] costs and expenses at trial."  (Docket Entry 121 at 14-15.)  The exclusion of the New Evidence independently necessitates exclusion of those portions of the New Report that rely thereon, and the determination that Plaintiff possesses priority rights to the disputed mark (see Docket Entry 202 at 5) lessens the importance of the New Report's calculation of Plaintiff's profits to resolution of this action.  Thus, the second factor militates against Defendants.

As for the third factor, "the prejudice to the opposing party by allowing the disclosures," Akeva, 212 F.R.D. at 311, Defendants contend that "there is little prejudice to Sacks by permitting the [New] Report" because "Sacks received the [New Evidence] prior to Saitz's deposition and had the opportunity to and did question Saitz on her updated analysis."  (Docket Entry 121 at 15.)  For the fourth factor, "the availability of alternative or lesser sanctions," Akeva, 212 F.R.D. at 311, Defendants propose, "as an alternative to excluding the [New] Report, the Court could permit Rogers to submit a second rebuttal report to respond to Saitz's

45

updated profit calculations." (Docket Entry 121 at 15.) These contentions fare no better applied to the New Report than to the New Evidence.

For the fifth and sixth factors, "the interest in expeditious resolution of litigation[ and the C]ourt's need to manage its docket," Akeva, 212 F.R.D. at 311, Defendants limit their arguments to Plaintiff's alternative request for additional discovery if the Court denied the Motions. (See Docket Entry 121 at 16 ("[Plaintiff] is using this Motion as leverage . . . to seek a 'redo' of its claims, fact discovery, and expert discovery. . . . If this Court were to grant [the Expert Report] Motion, [Plaintiff] would ensure that this case is delayed for several more months, if not years.").) This case, filed more than seventeen months ago, goes to trial in less than three months and even Defendants' proposed alternative sanction "of permitting Rogers to submit a second rebuttal report" (id.) would interject further delay into these proceedings. Accordingly, these factors also counsel exclusion of the New Report.

As for the final factor, "public policy favoring disposition of cases on the merits," Akeva, 212 F.R.D. at 311, Defendants contend:

> The dispositive issue in the case is whether Grin was the first party to sell its products bearing the Grin mark in U.S. commerce, trumping Sacks' other perceived rights to the Grin mark. This issue can be decided on summary judgment without resolution of the [Expert Report] Motion. With the deadline for dispositive motions

46

> quickly approaching, the Court has an opportunity to hear
> Grin's forthcoming motion for summary judgment, resolving
> this case on the merits in an efficient manner.  Sacks,
> by contrast, seeks to prolong the action indefinitely by
> revisiting its prior unsuccessful motion to amend,
> reopening fact discovery, and resetting expert deadlines.

(Docket Entry 121 at 16-17.)   Although Defendants correctly predicted that the Court could resolve the parties' summary judgment motions prior to resolution of the Motions (see Docket Entry 202 at 1-5), that development provides little help to Defendants.  Given the exclusion of the New Evidence and the conclusion that Plaintiff possesses priority rights to the disputed mark, exclusion of the New Report will have little, if any, impact on the merits of this action.

In sum, Defendants failed to establish good cause for their belated production of the New Report in violation of Rule 16(f), and the Akeva factors counsel exclusion of the New Report.  The Court will accordingly grant Plaintiff's request to exclude the New Report and any associated testimony from Saitz.

## V. Attorney's Fees

Plaintiff also requests an award of attorney's fees for the Motions.  (See Docket Entry 108 at 1; Docket Entry 110 at 1.) Defendants oppose the request for attorney's fees, maintaining that they did not violate the Rules.   (See Docket Entry 120 at 23; Docket Entry 121 at 18.)  Alternatively, Defendants contend that "any failure [regarding the New Evidence] was substantially justified or harmless" (Docket Entry 120 at 23) and that, for the

47

New Report, "lesser consequences" (Docket Entry 121 at 18), namely "permit[ting] Rogers to submit a second rebuttal report to respond to Saitz's updated profit calculations" (id. at 15), "are more appropriate" (id. at 18). For the reasons discussed above, these contentions lack merit. The Court will therefore award Plaintiff its reasonable attorney's fees for the Motions. See Indura S.A. v. Engineered Controls Int'l Inc., No. 1:10cv457, 2011 WL 3862083, at *9 (M.D.N.C. Sept. 1, 2011) ("Instead of or in addition to any other sanction, the court must order the party, its attorney, or both to pay the reasonable expenses — including attorney's fees — incurred because of any noncompliance with [Rule 16], unless the noncompliance was substantially justified or other circumstances make an award of expenses unjust." (emphasis in original); Fed. R. Civ. P. 37(c)(1)(A) (specifying that, "[i]n addition to or instead of [excluding belatedly disclosed evidence], the [C]ourt, on motion and after giving an opportunity to be heard . . . may order payment of the reasonable expenses, including attorney's fees, caused by the failure [to comply with Rule 26(a) or Rule 26(e)]").

## CONCLUSION

Without justification, Defendants failed to timely produce the New Evidence, the belated disclosure of which qualifies as harmful. Similarly without justification, Defendants failed to timely disclose the New Report, violating the Scheduling Order.

48

**IT IS THEREFORE ORDERED** that the Motions (Docket Entries 108, 110) are **GRANTED** as follows: (i) Defendants may not use the New Evidence (or New Report) in any proceedings in this matter; (ii) the New Report is **STRICKEN**; (iii) Saitz may not testify regarding the New Evidence or any opinions in the New Report that do not specifically and fully appear in the Initial Report; and (iv) Plaintiff is awarded its reasonable attorney's fees for the Motions. On or before May 30, 2025, Plaintiff shall serve Defendants with a notice of the reasonable expenses, including attorney's fees, that Plaintiff incurred in bringing the Motions. On or before June 6, 2025, the parties shall meet and confer in-person or by video-conference about that notice. On or before June 13, 2025, Defendants shall file either a notice stating that the parties have resolved all issues regarding the amount of the reasonable expenses, including attorney's fees, that Defendants must pay Plaintiff or objections (spanning no more than 10 pages exclusive of attachments) to the amount of the reasonable expenses, including attorney's fees, claimed by Plaintiff. On or before June 20, 2025, Plaintiff shall file any response (spanning no more than 10 pages exclusive of attachments) to any such objections.

    This 9th day of May, 2025.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

49